# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br><br>HON. CYNTHIA M. RUFE |
| IN RE: DIVALPROEX ER CASES<br><br>THIS DOCUMENT RELATES TO:<br><br>*ALL DIVALPROEX ER DIRECT PURCHASER ACTIONS* | LEAD CASE: 16-DV-27240<br>DIRECT CASE: 16-DV-27241<br><br>JURY TRIAL DEMANDED |
| AHOLD USA, INC.; CÉSAR CASTILLO, INC.; FWK HOLDINGS, L.L.C.; KPH HEALTHCARE SERVICES, INC., a/k/a KINNEY DRUGS, INC.; and ROCHESTER DRUG CO-OPERATIVE, INC.; on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>v.<br><br>DR. REDDY'S LABORATORIES, INC.; MYLAN INC.; MYLAN PHARMACEUTICALS INC.; PAR PHARMACEUTICAL, INC.; and ZYDUS PHARMACEUTICALS (USA) INC.,<br><br>                Defendants. | |

## CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT
TO MDL 2724 PROTECTIVE ORDER

## <u>TABLE OF CONTENTS</u>

Page

I.      INTRODUCTION ......................................................................................................1

II.     JURISDICTION AND VENUE ................................................................................6

III.    PARTIES ...................................................................................................................7

     A.      Plaintiffs .........................................................................................................7

     B.      Defendants ......................................................................................................8

     C.      Co-Conspirators ...........................................................................................10

IV.     INTERSTATE TRADE AND COMMERCE ..........................................................10

V.      FACTUAL ALLEGATIONS ..................................................................................11

     A.      The Generic Drug Market Is a Commodities Market, Where Competition
           Historically Has Been Keen...........................................................................11

           1.      Generic drugs should lead to lower prices................................................11

           2.      Prescription drug prices in the United States are governed by institutional
                 safeguards, which are intended to keep drug prices competitive...............14

     B.      Defendants' Conspired to, Among Other Things, Raise Divalproex ER Prices. ..18

           1.      Defendants' dominance over Divalproex ER sales permitted them to fix
                 prices, and their abrupt price increases are otherwise inexplicable...........18

           2.      Defendants' collective market dominance permitted them to collude.......19

           3.      Defendants' effective prices were remarkably stable before skyrocketing
                 in the Class Period. ..................................................................................19

           4.      As part of the conspiracy, some Defendants increased their WAC
                 benchmarks in lockstep.............................................................................24

            5.      There are no shortages or other market changes that would justify
                 Defendants' price increases. .....................................................................26

     C.      Defendants Orchestrated Their Conspiracy Through In-Person Meetings and
           Other Forms of Communication. ...................................................................27

            1.      Investor communications demonstrate an intent to fix and maintain
                 supracompetitive prices to realize record profits.......................................41

  2.  Industry commentary indicates collusion is a plausible explanation for the increase in Divalproex ER price ................................................................43

 D. Defendants' Conduct in Generic Drug Pricing Is Under Investigation by the United States Congress, the DOJ, and the State Attorneys General. .....................45

  1.  Congress launched an investigation in response to news reports of a dramatic rise in price of certain generic drugs. ...........................................45

  2.  The DOJ launched a broad criminal investigation into anticompetitive conduct by generic drug manufacturers. ....................................................48

  3.  Led by the State of Connecticut, 45 attorneys general launched their own investigation of antitrust violations in the generic drug industry. .............54

VI. THE DIVALPROEX ER MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION ...57

VII. CLASS ACTION ALLEGATIONS ................................................................59

VIII. ANTITRUST INJURY .................................................................................61

IX. CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN ACT ......62

X. PRAYER FOR RELIEF ...............................................................................63

XI. JURY TRIAL DEMANDED .........................................................................64

## I.  INTRODUCTION

1.  Plaintiffs Ahold USA, Inc., César Castillo, Inc., FWK Holdings, L.L.C., KPH
Healthcare Services, Inc., a/k/a Kinney Drugs, Inc., and Rochester Drug Co-Operative, Inc., on
behalf of themselves and all others similarly situated, bring this Class Action Complaint on
behalf of a Class (defined below) of direct purchasers who purchased generic divalproex sodium
250 or 500 mg extended release 24 hour sustained action tablets ("Divalproex ER"), directly
from Defendants Dr. Reddy's Laboratories, Inc., Mylan Inc., Mylan Pharmaceuticals Inc., Par
Pharmaceutical, Inc., or Zydus Pharmaceuticals (USA) Inc.

2.  In the pharmaceutical industry, the entry of generic versions of branded drugs
usually results in aggressive price competition, which in turn reduces prices for drug
wholesalers, retail pharmacies, consumers, and third party payors.  Defendants here, however,
conspired to thwart the economic benefits of generic competition.

3.  This is a civil action seeking treble damages arising out of the Defendants'
unlawful scheme to fix, maintain, and stabilize prices, rig bids, and engage in market and
customer allocation of Divalproex ER.  As set forth below, Defendants' scheme violates Section
1 of the Sherman Act, 15 U.S.C. § 1.  Defendants were not alone in subverting the operation of a
competitive marketplace for generic pharmaceuticals.  Defendants' anticompetitive conduct in
the Divalproex ER market is part of a larger conspiracy or series of conspiracies involving many
generic pharmaceutical manufacturers and many generic pharmaceuticals.

4.  Plaintiffs' allegations are based on personal knowledge of these matters relating
to themselves and upon information and belief as to all other matters.  Parts of Plaintiffs'
allegations are based on information made public during ongoing government investigations of
Defendants and other generic pharmaceutical companies for alleged unlawful price-fixing and
other conduct in the generic pharmaceutical industry.

PUBLIC VERSION

5.      Divalproex ER is a commonly prescribed anticonvulsant indicated for the treatment of migraines and seizures, and its base compound, valproate, has been designated an essential medicine by the World Health Organization.[1]  Significantly, Divalproex ER is not a new compound. Its essential ingredient, valproate, has been known since the late 19th century.

6.      Divalproex ER has been available in generic form in the United States for almost a decade and the market for Divalproex ER is mature.  Defendants dominate the market for Divalproex ER.

7.      Beginning in approximately June 2013 and continuing today (the "Class Period"), Defendants and co-conspirators engaged in an overarching anticompetitive scheme in the market for Divalproex ER to artificially inflate prices through unlawful agreements between and among would-be competitors.  Defendants caused the price of these products to dramatically and inexplicably increase as much as ███ higher than prices in June 2013, as alleged in Section V(B)(3) herein.  The United States Government Accountability Office ("GAO") singled out Divalproex ER as an example of a generic pharmaceutical that "experienced an extraordinary price increase."[2]  This increase was the consequence of an agreement among Defendants to increase pricing and restrain competition for the sale of Divalproex ER in the United States. Defendants orchestrated their conspiracy through secret communications and meetings, both in

---

[1] According to the World Health Organization: "Essential medicines are those that satisfy the priority health care needs of the population. They are selected with due regard to public health relevance, evidence on efficacy and safety, and comparative cost-effectiveness.  Essential medicines are intended to be available within the context of functioning health systems at all times in adequate amounts, in the appropriate dosage forms, with assured quality and adequate information, and at a price the individual and the community can afford."  World Health Organization Website, Essential medicines, *available at* http://www.who.int/topics/essential_medicines/en/.

[2] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 2016), *available at* http://www.gao.gov/assets/680/679055.pdf.

PUBLIC VERSION

private and at public events, such as industry events and trade association meetings held by the

Generic Pharmaceutical Association ("GPhA") (now called the Association for Accessible

Medicines),[3] the Healthcare Distribution Management Association ("HDMA") (now called the

Healthcare Distribution Alliance), the Minnesota Multistate Contracting Alliance for Pharmacy

("MMCAP"), the National Association of Chain Drug Stores ("NACDS"), Efficient

Collaborative Retail Marketing ("ECRM"), and the National Pharmacy Forum ("NPF"),[4] among

others.

8.      Defendants' and other generic pharmaceutical manufacturers' conduct has

resulted in extensive scrutiny by federal and state regulators, including by the Antitrust Division

of the United States Department of Justice ("DOJ"), the United States Senate, the United States

House of Representatives, and at least 45 attorneys general from 44 states and the District of

Columbia (the "State AGs").  The DOJ empaneled a federal grand jury in this District, which has

issued subpoenas relating to price-fixing and other anticompetitive conduct in the generic

pharmaceutical industry, including to Defendants Par and Zydus.

9.      The DOJ's and State AGs' investigations followed a congressional hearing and

investigation prompted by the National Community Pharmacists Association's ("NCPA")

January 2014 correspondence to the United States Senate Health Education Labor and Pensions

("HELP") Committee and the United States House Energy and Commerce Committee requesting

---

[3] *See* Russell Redman, *New name for Generic Pharmaceutical Association*, CHAIN DRUG REVIEW (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-generic-pharmaceutical-association/.

[4] The NPF is an annual industry event co-hosted by the Healthcare Supply Chain Association and the Healthcare Industry Supply Chain Institute.

hearings on significant spikes in generic pharmaceutical pricing.[5]   The NCPA's news release

reported price hikes on essential generic pharmaceuticals exceeding 1,000% in some instances,

according to its survey of over a thousand community pharmacists, resulting in some patients

being forced to leave their prescriptions at the pharmacy counter due to increased copays, and

forcing more seniors into Medicare's coverage gap (or "donut hole") where they must pay far

higher out-of-pocket costs.

10.     On December 12 and 13, 2016, the DOJ filed its first criminal charges against two

former executives of Heritage Pharmaceuticals: Jeffrey Glazer and Jason Malek.  *See United*

*States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of*

*America v. Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).  The DOJ alleged that both

Glazer and Malek conspired with others "to allocate customers, rig bids, and fix and maintain

prices" of generic glyburide and doxycycline sold in the United States.  Each was charged with

two felony counts under the Sherman Act, 15 U.S.C. § 1.  On January 9, 2017, both Glazer and

Malek pleaded guilty to the charges.  They continue to cooperate with the DOJ's ongoing

investigation as they await sentencing.

11.     The DOJ has publicly acknowledged that its investigation overlaps with MDL

2724.  For example, the DOJ filed a motion for a stay of discovery in MDL 2724 noting that:

> Evidence uncovered during the criminal investigation implicates
> other companies and individuals (including a significant number of
> the Defendants here) in collusion with respect to doxycycline
> hyclate, glyburide, and other drugs (including a significant number
> of the drugs at issue here).[6]

---

[5] News Release, *Generic Drug Price Spikes Demand Congressional Hearing,*
*Pharmacists Say* (Jan. 8, 2014), *available at* http://www.ncpanet.org/newsroom/news-
releases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say.

[6] *See* Intervenor United States' Motion to Stay Discovery, *In re: Generic Pharm. Pricing*
*Antitrust Litig.*, MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

12.     Soon after the DOJ filed criminal charges, 20 state attorneys general led by the State of Connecticut also sued generic manufacturers Aurobindo, Citron, Heritage, and Teva, as well as Mayne and Mylan for bid rigging, price-fixing and market and customer allocation in connection with their sale of generic glyburide and doxycycline in the United States.  On March 1, 2017, the complaint in the State AGs' action was amended to, *inter alia*, add claims of an additional 20 state attorneys general, bringing the total number of state AGs prosecuting the action to 40.  Glazer and Malek entered into settlement agreements with the attorneys general on March 16, 2017.[7]  Commenting on the scope of its current antitrust investigation, the Connecticut Attorney General ("CTAG") George Jepsen stated that "[t]he issues we're investigating go *way beyond* the two drugs and six companies.  *Way beyond…We're learning new things every day*."[8]  On July 17, 2017, 5 additional attorneys general joined the action by filing a nearly identical complaint and a notice of related case.[9]

13.     As noted above, the State AGs' and DOJ's investigations are ongoing.  Just last week, Pfizer Inc. reported in an SEC filing dated August 10, 2017 that:

> As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business.  We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry.  The government has been obtaining information from Greenstone.

---

[7] John Kennedy, *Ex-Heritage Execs to Help States Probe Drug Price-Fixing*, LAW360 (May 24, 2017), *available at* https://www.law360.com/competition/articles/927899/ex-heritage-execs-to-help-states-probe-drug-price-fixing?nl_pk=eb0b62b3-08e3-46ed-ac8a-7ab5fa616c07&utm_source=newsletter&utm_medium=email&utm_campaign=competition.

[8] Liz Szabo, et al., *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, THE DAILY BEAST (Dec. 21, 2016), *available at* http://thebea.st/2haV9xg (emphasis added).

[9] *Arkansas v. Aurobindo Pharma USA, Inc.*, No. 17-cv-1180 (D. Conn.).

14.     As a result of Defendants' scheme to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Divalproex ER, direct purchasers paid, and continue to pay, supracompetitive prices for Divalproex ER.

15.     Plaintiffs, on behalf of themselves and members of a direct purchaser class, seek damages caused by Defendants' and co-conspirators' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

17.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d), because during the Class Period Defendants transacted business throughout the United States, including in this District, Defendants resided, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

18.     During the Class Period, Defendants sold and distributed generic pharmaceuticals in a continuous and uninterrupted flow of interstate commerce, which included sales of Divalproex ER in the United States, including in this District.  Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

19.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the selling and distribution of Divalproex ER throughout the United States, including in this District; (c) had and maintained substantial contacts within the United States,

including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices

for Divalproex ER that was directed at and had the intended effect of causing injury to persons

residing in, located in, or doing business throughout the United States, including in this District.

<div align="center">

**III.    PARTIES**

</div>

**A.    Plaintiffs**

20.    Plaintiff Ahold USA, Inc. ("Ahold") is a Maryland corporation with its principal

places of business in Quincy, Massachusetts and Carlisle, Pennsylvania.  During the Class

Period, Ahold purchased Divalproex ER directly from one or more Defendants.  As a result of

Defendants' antitrust conspiracy, Ahold paid supracompetitive prices for its Divalproex ER

purchases and was injured by the illegal conduct alleged herein.

21.    Plaintiff César Castillo, Inc. ("CCI") is a Puerto Rico corporation with its

principal place of business in Rio Piedras, Puerto Rico.  During the Class Period, CCI purchased

Divalproex ER directly from one or more Defendants.  As a result of Defendants' antitrust

conspiracy, CCI paid supracompetitive prices for its Divalproex ER purchases and was injured

by the illegal conduct alleged herein.

22.    Plaintiff FWK Holdings, LLC ("FWK") is an Illinois corporation with its

principal place of business in Glen Ellyn, Illinois.  FWK is the assignee of antitrust claims

possessed by Frank W. Kerr Company ("Kerr") and brings this action as successor-in-interest to

Kerr's claims arising from its purchase of Divalproex ER directly from one or more of the

Defendants during the Class Period.  As a result of Defendants' antitrust conspiracy, FWK,

through assignor Kerr, paid supracompetitive prices for its Divalproex ER purchases and was

injured by the illegal conduct alleged herein.

23.    Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. ("KPH") is a

New York corporation with its principal place of business in Gouverneur, New York.  KPH

operates retail and online pharmacies in the Northeast under the name Kinney Drugs, Inc.

During the Class Period, KPH directly purchased Divalproex ER from one or more of the

Defendants.  As a result of Defendants' antitrust conspiracy, KPH paid supracompetitive prices

for its Divalproex ER purchases, and KPH was injured by the illegal conduct alleged herein.

24.     Plaintiff Rochester Drug Co-Operative, Inc. ("RDC") is a New York corporation

with its principal place of business in Rochester, New York.  During the Class Period, RDC

purchased Divalproex ER directly from one or more of the Defendants at artificially and

unlawfully inflated prices.  As a result of Defendants' antitrust conspiracy, RDC paid

supracompetitive prices for its Divalproex ER purchases, and RDC was injured by the illegal

conduct alleged herein.

**B.     Defendants**

25.     Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a New Jersey

corporation with its principal place of business in Princeton, New Jersey.  Dr. Reddy's is a

wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian pharmaceutical company.

During the Class Period, Dr. Reddy's sold Divalproex ER to purchasers in this District and

throughout the United States.  Dr. Reddy's sells Divalproex ER pursuant to Abbreviated New

Drug Applications ("ANDAs") that were approved by the United States Food and Drug

Administration ("FDA") in March 2012.

26.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of

business in Canonsburg, Pennsylvania.

27.     Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its

principal place of business in Morgantown, West Virginia.

28.     Mylan Inc. and Mylan Pharmaceuticals Inc. are wholly-owned subsidiaries of

Mylan N.V., a Dutch pharmaceutical company.  In this complaint, Defendants Mylan Inc. and

Mylan Pharmaceuticals Inc. are together referred to as "Mylan."  During the Class Period, Mylan sold Divalproex ER to purchasers in this District and throughout the United States.  Mylan sells Divalproex ER pursuant to ANDAs that were approved by the FDA in January 2009.

29.     Par is a subsidiary of Endo International plc ("Endo"), an Irish pharmaceutical company.  In September 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Par, from a private investment firm for about $8 billion in cash and stock.  At that time Endo created a combined U.S. Generics segment that included Par, and Endo's subsidiary Qualitest, naming the segment Par Pharmaceutical, Inc.  During the Class Period, Par sold Divalproex ER to purchasers in this District and throughout the United States. Par sells Divalproex ER pursuant to ANDAs that were approved by the FDA in February 2009.[10]

30.     Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, New Jersey. Zydus is a subsidiary of Zydus Pharmaceuticals Limited, an Indian pharmaceutical company. During the Class Period, Zydus sold Divalproex ER to purchasers in this District and throughout the United States.  Zydus sells Divalproex ER pursuant to ANDAs that were approved by the FDA in February and March 2009.

31.     Defendants and their officers, agents, employees, or representatives have engaged in the conduct alleged in this Complaint while actively involved in the management of Defendants' business and affairs.

---

[10] Par sells Divalproex ER pursuant to ANDAs that were filed by Anchen Pharmaceuticals. Par acquired Anchen Pharmaceuticals in 2011.

**C.    Co-Conspirators**

32.    Various other persons, firms, entities, and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

33.    The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs.  Plaintiffs may amend this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

34.    At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

35.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

36.    The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## IV.    INTERSTATE TRADE AND COMMERCE

37.    Defendants are the leading manufacturers and suppliers of Divalproex ER sold in the United States.

PUBLIC VERSION

38.     Divalproex ER is produced by or on behalf of Defendants or their affiliates in the United States or overseas.

39.     During the Class Period, Defendants, directly or through one or more of their affiliates, sold Divalproex ER throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

40.     The activities of Defendants and their co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

41.     Defendants' and their co-conspirators' conduct, including the marketing and sale of Divalproex ER, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

42.     The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiffs of the benefits of free and open competition in the purchase of Divalproex ER within the United States.

43.     Defendants' agreement to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Divalproex ER, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing Divalproex ER prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## V.     FACTUAL ALLEGATIONS

### A.     The Generic Drug Market Is a Commodities Market, Where Competition Historically Has Been Keen.

#### 1.     Generic drugs should lead to lower prices.

44.     Generic drugs provide a lower-cost but bioequivalent alternative to brand drugs. Before any generic drug can be marketed, the FDA requires rigorous testing to ensure it has the

same strength, quality, safety, and performance as the brand.  By law, generics must have the same amount of active ingredient and must be "therapeutically equivalent" to the brand, meaning they must meet exacting bioequivalence testing specifications so patients can expect "equal effect and no difference when [generics are] substituted for the brand name product."[11]

45.     To encourage the production and sale of generic drugs, the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") simplified the regulatory hurdles that generic pharmaceutical manufacturers have to clear prior to marketing and selling generic pharmaceuticals.  Instead of filing a lengthy and costly New Drug Application, the Hatch-Waxman Act allows generic pharmaceutical manufacturers to obtain FDA approval in an expedited fashion.

46.     To obtain marketing approval for a generic pharmaceutical, an ANDA must be filed with the FDA's Center for Drug Evaluation and Research, Office of Generic Drugs; "abbreviated" because so long as the ANDA includes data showing bioequivalence to the brand, the ANDA sponsor can reference efficacy data supporting approval of the brand (described in the regulations as the "Reference Listed Drug" or "RLD" for short) instead of repeating all the same clinical trials.  Upon the FDA's determination that bioequivalence to the brand has been established, the ANDA will be approved and may be marketed in the United States as substitutable with the RLD.

47.     Although equivalent from a safety and efficacy standpoint, generic versions of brand name drugs are priced significantly below their brand counterparts, and because of this, they rapidly gain market share from the brand beginning immediately following launch.  Indeed,

---

[11] FDA, *Drugs@FDA Glossary of Terms*, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

PUBLIC VERSION

in every state, pharmacists are permitted (and in many states required) to substitute a generic product for a brand product barring a note from a doctor that the brand product must be dispensed as written.

48.     It is well established in economic literature that competition by generic products results in lower prices for drug purchasers.  In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price free from competitive market forces.  But once the first lower-priced generic enters, a brand drug rapidly loses sales due to automatic pharmacy counter substitution, and generics capture as much as 80% of the market or more within months of launch.  And as more generics become available, generic prices only decline further due to competition among generics.  These cost reductions to drug purchasers were the very legislative purpose behind the abbreviated regulatory pathway for generic approval under the Hatch Waxman Act.

49.     Generic competition, under lawful and competitive circumstances, reduces drug costs by driving down the prices of both generic versions of the brand drug and often the brand drug itself, and every year generic drugs result in hundreds of billions of dollars in savings to consumers, insurers, and other drug purchasers.

50.     A Federal Trade Commission study found that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[12]  A mature generic market, such as the market for Divalproex ER, has several generic competitors.  Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for

_____

[12] Federal Trade Commission, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions*, at 8 (Jan. 2010), *available at* https://www.ftc.gov/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff.

competition among manufacturers.[13]  Over time, generics' pricing nears the generic

manufacturers' marginal costs.

51.     Generic competition usually enables purchasers to purchase generic versions of

the brand drug at a substantially lower price than the brand drug. Generic competition to a single

blockbuster brand drug can result in billions of dollars in savings to direct purchasers,

consumers, insurers, local, state, and federal governments, and others.  Indeed, one study found

that the use of generic drugs saved the United States healthcare system $1.68 trillion between

2005 and 2014.[14]

**2.     Prescription drug prices in the United States are governed by institutional
     safeguards, which are intended to keep drug prices competitive.**

52.     Ordinarily, the price for a consumer product is set by the retailer based on the

amount the typical consumer is willing to pay.  But because of the unique features of the

prescription drug marketplace, prescription drug pricing for most consumers is not determined

between the retailer and the consumer.  Rather, because most consumers' prescription drug

purchases are reimbursed by public or private health plans, consumer pricing for prescription

drugs is determined by reimbursement agreements between these prescription drug payers, *i.e.*,

health plans and their prescription benefit managers, and the pharmacies that dispense drugs to

the payers' insured customers.

---

[13] *See, e.g.*, Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at* https://www.ftc.gov/reports/authorized-generic-drugs-short-term-effects-long-term-impact-report-federal-trade-commission; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/publication/10938.

[14] GPhA, GENERIC DRUG SAVINGS IN THE U.S. (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

53.     Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs.  WAC prices represent the manufacturer's benchmark or reported list price.  The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume sales.  Manufacturers generally provide their WACs to purchasers or report them to publishers that compile that information for the market.[15]

54.     Generic drug manufacturers may charge different amounts for an equally interchangeable, *i.e.*, therapeutically equivalent, multisource drug.  But manufacturers are usually constrained in their ability to price generic drugs by the Maximum Allowable Cost ("MAC").[16] MAC is a contractually based payment model that, in the private sector, is commonly established by a pharmacy benefits manager ("PBM"), who manages an insurance plan, and that is paid to the pharmacies within the plan's network.[17]  A MAC price sets the upper limit that a pharmacy will be paid by the PBM for procuring and dispensing a particular generic medication.

---

[15] At one time, payors relied on cost-based pricing metrics to reimburse pharmacies that dispensed drugs to their insured customers, paying the dispensing pharmacies an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.  Over time, however, it was learned that the list price for most generic drugs published by their manufacturers was substantially higher than the actual cost incurred by pharmacies to acquire the drugs

[16] To define therapeutic categories, MAC pricing typically relies on the FDA's Orange Book, which lists approved prescription drugs and their therapeutic equivalents.  An "A"-rated drug is one that the FDA considers to be therapeutically equivalent to other pharmaceutically equivalent products.  *See* U.S. FDA Website, Orange Book Preface, *available at* https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#tecode.

[17] Academy of Managed Care Pharmacy, *Where We Stand, Maximum Allowable Cost (MAC) Pricing* (Dec. 2013), *available at* www.amcp.org/Sec.aspx?id=9287.  For the purposes of this complaint, MAC prices refer solely to prices that limit a pharmacy's reimbursement for generic drugs, not the amounts PBMs charge to the insurance plans, which may also be referred to as a MAC price.  *See* National Community Pharmacists Association, *The Need for Legislation Regarding "Maximum Allowable Cost" (MAC) Reimbursement*, *available at* http://www.ncpa.co/pdf/leg/mac-one-pager.pdf.

55.     While PBMs usually do not disclose publicly which drugs they subject to MAC pricing, what the MAC price is, or what factors they apply to set MAC prices, it is believed that PBMs rely on a wide-variety of market-wide pricing information or plan-specific data.[18]  In recent years, 79% of employer prescription drug plans and 45 state Medicaid programs have been using MAC prices to control the cost of generic drugs.[19]  MAC prices give pharmacies an incentive to procure and dispense the lowest-priced drug product available for a particular multisource drug. If a generic drug is subject to MAC pricing, a pharmacy purchasing a higher-priced generic product will make less profit or potentially even lose money when it dispenses a higher-priced product.[20]

56.     MAC pricing is neither uniform, nor transparent and may be subject to frequent changes.  So whether a generic manufacturer's products are even subject to MAC pricing or how that MAC pricing is set for any particular generic drug is not easy for the manufacturers to decipher.  PBMs typically exercise control over the selection of generic medications that will be subjected to MAC pricing, and they fiercely guard the secrecy of their MAC price lists.[21]  Industry groups, like the Academy of Managed Care Pharmacy, actively oppose government regulation of MAC pricing and any efforts to disclose MAC prices or the method of calculating them.[22]

57.     By setting a ceiling for reimbursement of any particular generic drug at the pharmacy level, MAC prices indirectly affect the price at which generic drug manufacturers may

---

[18] *Id.*

[19] Express Scripts, *MAC Pricing lncents More Affordable Rx* (Feb. 24, 2016), *available at* http://lab.express-scripts.com/lab/insights/drug-options/mac-pricing-incents-more-affordable-rx.

[20] *See supra* Academy of Managed Care Pharmacy article.

[21] *See supra* National Community Pharmacists Association article.

[22] *See supra* Academy of Managed Care Pharmacy article.

sell their products to direct purchasers.  Because many generic drugs are subject to MAC pricing, generic drug manufacturers have an incentive to price their generic drug products competitively to maintain demand by pharmacies.

58.     MAC pricing can penalize the generic drug manufacturer that raises price on its own when its competitors do not.  A unilateral price increase in a competitive generic drug market that is subject to MAC pricing is likely to send buyers to a lower-price alternative.  MAC pricing has little effect if generic drug manufacturers collectively increase their prices for a multi-source drug.  First, PBMs generally permit pharmacies—who may be contractually obligated to dispense an unprofitable prescription—to challenge MAC prices under a MAC appeals process.[23]  If the price of a generic drug has been increased by the majority of generic drug manufacturers, then these MAC appeals may be successful in getting the PBM to increase the MAC price allowed.  Second, PBMs typically have a policy of revising MAC prices under certain contingencies.[24]  One large PBM, Express Scripts, for example, states that its MAC price list is frequently updated to reflect "the current market dynamics."[25]

59.     MAC pricing provides yet another reason that Defendants' stark increases in the price of Divalproex ER are indicative of coordinated pricing activity.  Knowing that they hold an overwhelming majority share of the market for Divalproex ER, Defendants had the capacity to dictate the market price and to influence the MAC prices set by PBMs, but only if they acted collectively.  Absent collusion, individual Defendants could not have increased their prices to the high levels they did (or maintain high prices in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.

---

[23] *Id.*

[24] *Id*.

[25] *See supra* Express Scripts article.

PUBLIC VERSION

**B.      Defendants' Conspired to, Among Other Things, Raise Divalproex ER Prices.**

      **1.      Defendants' dominance over Divalproex ER sales permitted them to fix prices, and their abrupt price increases are otherwise inexplicable.**

60.      The market for Divalproex ER is mature, as generic versions have been on the market for years.  In 2014 alone, Defendants' total revenue from direct sales of these products was approximately ████.[26]  This compares to only ████ in 2012, a year before the price-fixing conspiracy.

61.      A mature generic market, such as the market for Divalproex ER, has several generic competitors.  As noted above, because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.  In a market free from collusive activity, over time, generics' pricing would naturally near (and stay near) the generic manufacturers' marginal costs.

62.      At all times relevant for this lawsuit, there have been at least three manufacturers of Divalproex ER on the market.  Under accepted economic principles of competition, when there are multiple generics on the market, prices should remain at highly competitive, historic levels, and should not increase starkly as they did here absent anticompetitive conduct.  Drastic

---

[26] Revenue, unit sales, and effective prices are obtained from QuintilesIMS Inc. ("IMS Health").  IMS Health is the largest vendor of physicians' prescribing data in the United States and is widely relied upon in the pharmaceutical industry and elsewhere.  As used in this complaint, "effective prices" represent actual transaction prices, as reported by IMS Health.  Plaintiffs calculate Defendants' effective prices based on IMS Health's National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices[.]" IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives, at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

     Effective prices are calculated to multiple decimals.  For ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precisely calculated price.

increases in Divalproex ER prices are themselves suggestive of Defendants' collective market dominance: if they did not already dominate the market, Defendants' pricing excesses would be disciplined because they would lose market share to non-colluding competitors.

**2.      Defendants' collective market dominance permitted them to collude.**

63.      During the Class Period, the Defendants dominated the market with about a ███ share.[27]

64.      In terms of revenue, in 2014, Defendants' sales to direct purchasers were roughly ████████, Defendant Dr. Reddy's were about ████████, Defendant Mylan's were about ████████, Defendant Par's were about ████████, and Defendant Zydus's were about ████ ████.

**3.      Defendants' effective prices were remarkably stable before skyrocketing in the Class Period.**

65.      Only Defendants Mylan and Par were selling any significant amounts of the relevant Divalproex ER products before the Class Period.  Before the Class Period, their effective prices remained stable for years, as is typical in a mature market.  From December 2010 through May 2013, *i.e.*, for over two years leading up to the price-fixing conspiracy, the standard deviation percentage of mean prices for Defendants Mylan and Par was no more than ███.

66.      As illustrated below, Mylan and Par's effective prices inexplicably increased sharply beginning in June 2013:

---

[27] Market share is calculated in this complaint by reference to IMS unit sales data.

76. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

77.     Defendants' price increases coincide with increases reported by the Centers for

Medicare & Medicaid Services:



Source: NADAC Price Data



Source: NADAC Price Data

4.    **As part of the conspiracy, some Defendants increased their WAC benchmarks in lockstep.**

78.    Although MAC pricing has been implemented to discourage unilateral price increases of generic drugs by setting an upper limit, an individual manufacturer's WAC increase influences the actual prices paid by direct purchasers. This is the case here, where Defendants dominate the Divalproex ER market. Mylan and Par set identical WACs within a couple weeks of each other at the start of the Class Period; and Dr. Reddy's and Zydus matched those WACs in August, around the time they each entered the market:[28]

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 250 mg ER, 100 ct. | Mylan | 00378-0472-01 | $0.60 | $1.96 | 14-Jun-13 | 230% |

[28] For ease of reference, WAC prices are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 250 mg ER, 500 ct. | Mylan | 00378-0472-05 | $0.57 | $1.96 | 14-Jun-13 | 247% |
| 250 mg ER, 90 ct. | Mylan | 00378-0472-77 | $1.34 | $1.96 | 14-Jun-13 | 46% |
| 250 mg ER, 100 ct. | Par | 10370-0510-10 | $0.60 | $1.96 | 26-Jun-13 | 230% |
| 250 mg ER, 500 ct. | Par | 10370-0510-50 | $0.57 | $1.96 | 26-Jun-13 | 247% |
| 250 mg ER, 100 ct. | Dr. Reddy's | 55111-0533-01 | * | $1.96 | 19-Aug-13 | * |
| 250 mg ER, 500 ct. | Dr. Reddy's | 55111-0533-05 | * | $1.96 | 19-Aug-13 | * |
| 250 mg ER, 100 ct. | Zydus | 68382-0314-01 | * | $1.96 | 14-Aug-13 | * |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 500 mg ER, 100 ct. | Mylan | 00378-0473-01 | $0.74 | $3.26 | 14-Jun-13 | 338% |
| 500 mg ER, 500 ct. | Mylan | 00378-0473-05 | $0.71 | $3.26 | 14-Jun-13 | 361% |
| 500 mg ER, 90 ct. | Mylan | 00378-0473-77 | $2.36 | $3.26 | 14-Jun-13 | 38% |
| 500 mg ER, 100 ct. | Par | 10370-0511-10 | $0.74 | $3.26 | 26-Jun-13 | 338% |
| 500 mg ER, 500 ct. | Par | 10370-0511-50 | $0.71 | $3.26 | 26-Jun-13 | 361% |
| 500 mg ER, 100 ct. | Dr. Reddy's | 55111-0534-01 | * | $3.26 | 19-Aug-13 | * |
| 500 mg ER, 500 ct. | Dr. Reddy's | 55111-0534-05 | * | $3.26 | 19-Aug-13 | * |
| 500 mg ER, 100 ct. | Zydus | 68382-0315-01 | * | $3.26 | 14-Aug-13 | * |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 500 mg ER, 500 ct. | Zydus | 68382-0315-05 | * | $3.26 | 14-Aug-13 | * |

5.    **There are no shortages or other market changes that would justify Defendants' price increases.**

79.    During the Class Period, there was no significant increase in the costs of making Divalproex ER, no significant decrease in supply, and no significant increase in demand. Nonetheless, there were extraordinary increases by each of the Defendants in the prices they charged their customers for Divalproex ER. Such price increases in a commodity product for which there were no significant increases in costs or demand and no significant decrease in supply would not have been in each Defendant's unilateral self-interest absent the existence of a cartel.

80.    Federal law requires that drug manufacturers report drug shortages.[29] Divalproex ER is not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA. Divalproex ER also does not appear on any archived lists of the American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins from July 3, 2012, through today, nor does it appear on the current list of ASHP Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010). None of the Defendants reported any drug shortages or supply disruptions to the FDA in explanation for the supracompetitive pricing of Divalproex ER.

---

[29] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 STAT. 995, 1099-1108.

**C.    Defendants Orchestrated Their Conspiracy Through In-Person Meetings and Other Forms of Communication.**[30]

81.    During the Class Period, Defendants conspired, combined, and contracted to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Divalproex ER, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Divalproex ER.

82.    Beginning in June 2013, Defendants collectively caused the price of Divalproex ER to increase dramatically. Defendants' conduct cannot be explained by normal competitive forces. It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Divalproex ER in the United States. The agreement was furthered by discussions held at meetings and industry events hosted by the GPhA, HDMA, NACDS, and ECRM as well as other meetings and communications.

83.    In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other things:

(a)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of Divalproex ER in the United States;

(b)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid rigging for Divalproex ER sold in the United States;

(c)    Agreeing during those meetings, conversations, and communications to engage in market and customer allocation or bid rigging for Divalproex ER sold in the United States;

---

[30] The allegations included in this section pertaining to the HDMA and NACDS are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re: Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

- 27 -

(d)    Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Divalproex ER sold in the United States;

(e)    Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)    Selling Divalproex ER in the United States at collusive and noncompetitive prices; and

(g)    Accepting payment for Divalproex ER sold in the United States at collusive and noncompetitive prices.

84.    To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

85.    These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price-fixing, and market and customer allocation scheme.

86.    The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[31]  The State AGs have similarly noted the centrality of trade associations and industry

---

[31] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

conferences in their investigation stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[32]

87.     Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Divalproex ER, and to engage in market and customer allocation for Divalproex ER, including, but not limited to, GPhA, the NACDS, and HDMA. In addition, Defendants regularly attended industry events hosted by the ECRM.

88.     The GPhA (now called the Association for Accessible Medicines) is the "nation's leading trade association for drug manufacturers and distributors of generic prescription drugs . . . ."[33]  GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

89.     GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[34]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

---

[32] CTAG Website, Press Release, *40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit* (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[33] GPhA, *Membership*, http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership.

[34] *Id.*

90.     Defendants Dr. Reddy's, Mylan, Par, and Zydus have been regular members of the GPhA during the Class Period.  Regular members "are corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[35]

91.     Several of Defendants high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

a.      **2012 Board of Directors**: Joseph Renner, President & CEO of Zydus; and Tony Mauro, President of Mylan Inc.;

b.      **2013 Board of Directors:** Joseph Renner, President & CEO of Zydus; and Tony Mauro, President of Mylan Inc.;

c.      **2014 Board of Directors:** Joseph Renner, President & CEO of Zydus; and Tony Mauro, President of Mylan Inc.;

d.      **2015 Board of Directors:** Joseph Renner, President & CEO of Zydus; and Tony Pera, Chief Commercial Officer of Par; and

e.      **2016 Board of Directors:** Joseph Renner, President & CEO of Zydus; Tony Pera, Chief Commercial Officer of Par; Heather Bresch CEO of Mylan, Alok Sonig, EVP and Head of North America Generics of Dr. Reddy's.

92.     In addition, Former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to the price fixing and other anticompetitive activity concerning generic drugs, also served on GPhA's board of directors.

---

[35] *Id.*

93.     The NACDS is a national trade association representing chain community pharmacies.   Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

94.     The HDMA (now called HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[36]   HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.   HDMA members during the Class Period have included Defendants Dr. Reddy's, Mylan, Par, and Zydus.

95.     According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

96.     At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

97.     ███████████████████████████████████████████████████████
███████

98.     As further set forth below, meetings and events hosted by the GPhA, HDMA, NACDS, and ECRM were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.

---

[36] HDA, About, *available at* https://www.healthcaredistribution.org/about.

99.     For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland which was attended by representatives of each of the Defendants, including at least the following key executives:

a.      **Dr. Reddy's:** Victor Borelli, VP & Head, National Accounts, N.A. Generics; Jinping McCormick, VP Rx Marketing, US Generics; Jeff Burd, VP, Sales & Marketing; Jake Austin, Director, National Accounts; and

b.      **Mylan**: Marcie McClintic, Vice President and General Counsel.

100.    On February 20-22, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from all Defendants, including Dr. Reddy's, Mylan, Par, and Zydus.



102.    On April 20-23, 2013, NACDS held its 2013 Annual Meeting in Palm Beach, Florida. NACDS's  2013 Annual Meeting was attended by representatives from all Defendants, including at least the key executives for generic drug sales and pricing:

    a.    **Dr. Reddy's:** John Adams, Sr. VP, Sales & Marketing; Jeff Burd, VP, Sales & Marketing; Gary Benedict, EVP;

    b.    **Mylan:** Joe Duda, President, Mylan Pharmaceuticals; Robert Potter, SVP N.A. National Accounts and Channel Development; Tony Mauro, President of Mylan Inc.;

    c.    **Par:** Michael Altamuro, Vice President, Marketing; Paul Campanelli, President; Jon Holden, VP, Sales; Renee Kenney, Sr. Advisor, Generic Sales;

    d.    **Zydus:** Michael Keenley, President; Joseph Renner, President & CEO; Kristy Ronco, VP, Sales; Laura Short, VP, Sales; Karen Strelau, EVP Sales & Marketing.

103.    On June 2-5, 2013, HDMA held its 2013 Business and Leadership Conference ("BLC") in Orlando, Florida. HDMA's June 2013 Business and Leadership Conference was attended by representatives from all Defendants, including the following key executives for generic drug sales and pricing:

    a.    **Dr. Reddy's:** Victor Borelli, VP & Head, National Accounts, N.A. Generics; Patricia Wetzel, Senior Director, National Accounts; Michael Burton, Director, National Accounts;

    b.    **Mylan:** Janet Bell, National Accounts Director; Joseph Duda, President, Mylan Pharmaceuticals; Edgar Escoto, National Accounts Director; Kevin McElfresh, Executive Director, National Accounts; James Nesta, Executive Director, National Accounts; Robert O'Neill, VP; Sean Reilly, Key Account Manager; John Shane,

Director National Trade Accounts; Gary Tighe, National Accounts Director; Lance
Wyatt, National Accounts Director; Michael Aigner, Director, National Accounts;
John Baranick, Director, Trade Relations;

c.    **Par:** Sandra Bayer, National Accounts Manager; Peter Gargiulo, Director, National
Accounts; Jon Holden, Vice President, Sales; Christopher Neurohr, Director,
National Accounts;

d.    **Zydus:** Scott Goldy, Director, National Accounts; Kevin Green, National Accounts
Manager; Marc Kikuchi, Senior Vice President, Global Generics;

104.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended
by representatives from all Defendants, including Dr. Reddy's, Mylan, Par, and Zydus.

105.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo
Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended
by representatives from all Defendants, including at least the following key executives for generic
drug sales and pricing:

a.    **Dr. Reddy's:** Chris Costa, VP of Sales; Victor Borelli, VP & Head, National
Accounts, N.A. Generics; Jinping McCormick, VP Rx Marketing, US Generics;
Nimish Muzumdar, Director of Marketing; Larry Knupp, Director of National
Accounts; Gary Benedict, EVP; Umang Vohra, EVP & Head of NA Generics;

b.    **Mylan:** Mike Aigner, Director, National Accounts; Joe Duda, President, Mylan
Pharmaceuticals; Kevin McElfresh, Executive Director, National Accounts; Robert
O'Neill, Head of Sales, Generic NA; Robert Potter, SVP, National Accounts &
Channel Development; Lance Wyatt, Director, National Accounts; Matt Cestra, Sr.
Director Marketing; Rodney Emerson, Director, Pricing & Contracts; Edgar Escoto,

Director National Accounts; Stephen Krinke, National Accounts Manager; Sean Reilly, National Accounts Manager;

c.   **Par**: Michael Altamuro, VP, Marketing; Gerald Burton, VP, National Accounts; Christine Caronna, Director National Accounts; Rick Guillory, VP, National Accounts; Jon Holden, VP Sales; Renee Kenney, Sr. Advisor Generic Sales; Karen O'Connor, VP, National Accounts; and

d.   **Zydus**: Michael Keenley, President; Joseph Renner, President & CEO; Kristy Ronco, VP, Sales; Laura Short, VP, Sales; Karen Strelau, EVP Sales & Marketing; Elizabeth Purcell, Sr. Director, Marketing and Portfolio Management; Ganesh Nyak, COO & Executive Director; Daniel Lukasiewicz, Sr. Manager, Marketing Ops; Sharvil Patel, Deputy Managing Director.

106.   On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants.

107.   On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from all Defendants.



109. On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives from all Defendants, including at least the following key executives for generic drug sales and pricing:

a. **Dr. Reddy's:** Victor Borelli, VP & Head, National Accounts, N.A. Generics; Jinping McCormick, VP Rx Marketing, US Generics; Michael Allen (Vice President & Head, Rx Products, N.A. Generics).

b. **Mylan**: Joe Duda, President, Mylan Pharmaceuticals; Tony Mauro, President, Mylan Inc.; Robert Potter, SVP N.A. National Accounts & Channel Development; Rob O'Neill, Head of Sales; Hal Korman, EVP & Chief Operating Officer; John Munson, Vice President Global Accounts;

c. **Par**: Jon Holden, Vice President of Sales; Paul Campanelli, President; Renee Kenney, Senior Advisor Generic Sales; Michael Altamuro, VP, Marketing;

d. **Zydus:** Michael Keenley, President; Joseph Renner, President & CEO; Kristy Ronco, VP, Sales; Scott Goldy, Director, National Account; Kevin Green, AVP, National Accounts.

110. On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona. The June 1-4, 2014 BLC was attended by representatives from all Defendants, including at least the following key executives for generic drug sales and pricing:

a. **Dr. Reddy's:** Chris Costa, VP of Sales; Victor Borelli, VP & Head, National Accounts, N.A. Generics; Mike Allen, VP & Head, Generics; Katherine Neely, Associate Director, Generics Marketing, North America;

b. **Mylan**: Joseph Zankus, VP, N.A. Sales & Channel Strategy; Lance Wyatt, Director National Accounts; Edgar Escoto, Director National Accounts; Michael Aigner, National Accounts Manager; John Baranick, Director Trade Relations; Joseph Duda, President, Mylan Pharmaceuticals; James Nesta, President Sales; Frank Mullery, Senior Director and Controller; Richard Isaac, Senior Manager, Strategic Accounts;

c. **Par:** Sandra Bayer, National Accounts Manager; Peter Gargiulo, Director, National Accounts; Jon Holden, Vice President, Sales;;

d. **Zydus:** Scott Goldy, Director, National Accounts; Kevin Green, National Accounts Manager; Marc Kikuchi, Senior Vice President, Global Generics; Maria McManus, Corporate Account Manager; Jodi Weber, Corporate Account Manager.

111.   On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from at least Defendants Dr. Reddy's, Mylan, Par and Zydus.

112.   On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by at least the following representatives from all Defendants, who were key executives for generic drug sales and pricing:

a. **Dr. Reddy's:** Chris Costa, VP of Sales; Victor Borelli, VP & Head, National Accounts, N.A. Generics; Jinping McCormick, VP Rx Marketing, US Generics; Nimish Muzumdar, Director of Marketing; Larry Knupp, Director of National

Accounts; Umang Vohra, EVP & Head of NA Generics; Jake Austin, Director National Accounts;

b.   **Mylan**: Joe Duda, President, Mylan Pharmaceuticals; Robert Potter, SVP N.A. National Accounts; Mike Aigner, Director, National Accounts; Tony Mauro, President of Mylan Inc.; Kevin McElfresh, Executive Director, National Accounts; Gary Tighe, Director, National Accounts; Lance Wyatt, Director, National Accounts; Edgar Escoto, Director, National Accounts; Stephen Krinke, National Account Manager; Sean Reilly, National Account Manager; Michael Scouvart, Head of Marketing, N.A.; John Baranick, Director, Trade Relations; Jim Nesta, Vice President, Sales;

c.   **Par:** Michael Altamuro, Vice President, Marketing & Business Analytics; Gerald Burton, Vice President, National Accounts; Christine Caronna, Director, National Accounts; Rick Guillory, Vice President, National Accounts; Jon Holden, Vice President, Sales; Renee Kenney, Senior Advisor Generic Sales; Karen O'Connor, Vice President, National Accounts; Antonio Pera, Chief Commercial Officer; and

d.   **Zydus:** Scott Goldy, Director, National Accounts; Kevin Green, Associate Vice President, National Accounts; Michael Keenley, President; Ganesh Nayak, Chief Operating Officer & Executive Director; Elizabeth Purcell, Sr. Director, Marketing and Portfolio Management; Joseph Renner, President and Chief Executive Officer; Kristy Ronco, Vice President, Sales; Maria Bianco-Falcone, Senior Director Contracting.

113.   On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants.

114.     In  2015, and 2016, Defendants continued to regularly attend trade association meetings, conferences and events, including: (i) the February 9-11, 2015 GPhA Annual Meeting in Miami, Florida; (ii) ████████████████████████████████████; (iii) the April 14 2015 HDMA Seventh Annual CEO Roundtable Fundraiser in New York City; (iv) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (v) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (vi) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (vii) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (viii) the April 16-19, 2016, NACDS 2016 Annual Meeting in Palm Beach, Florida; (ix) the August 6-9, 2016, NACDS 2016 Total Store Expo in Boston, Massachusetts.

115.     As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.[37]

116.     In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level

---

[37] *See, e.g.*, Amended Complaint (Public Version), *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 16-cv-2056, ECF 168 (D. Conn.), at ¶¶ 50-52, *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[38]

117.    A large number of generic drug manufacturers, including all Defendants here, are headquartered in close proximity to one another in New York, New Jersey, and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

118.    Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.  During these GNOs, meetings and dinners, these employees meet with their competitors and discuss competitively sensitive information.  For example, several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

119.    Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans.  This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

120.    Defendants also routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at

---

[38] *Id.* at ¶¶ 53-60.

the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

121.    Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

### 1. Investor communications demonstrate an intent to fix and maintain supracompetitive prices to realize record profits.

122.    Defendants' public statements and admissions in their investor communications show that Defendants realized record revenues during the Class Period and emphasize a commitment to increasing generic pharmaceutical prices as well as maintaining them at supracompetitive levels.

123.    **Dr. Reddy's.**  During Dr. Reddy's October 31, 2013 earnings call, Dr. Reddy's Vice Chairman Kallam Satish Reddy stated: "I'm pleased to announce the highest ever quarterly performance of Dr. Reddy's, back by strong growth across the key geographies of the Global Generics segment . . . [t]he recent generic launch[] of [] divalproex ER . . . in the U.S. demonstrates our ability to build a sustainable limited competition portfolio . . . and has resulted in enhancement of our gross margin and operating margins as well."

124.    **Mylan**:  On October 25, 2012, Mylan's CEO Heather Bresch stated in an earnings call: "You've heard me quarter after quarter coming and saying we weren't going to chase the bottom, that there's been irrational behavior and that we would continue to hold steady and control what we can control."

125.    On May 2, 2013, Bresch stated in an earnings call: "From my perspective, we see the generic industry alive and well.  We still see a lot of runway room here in the United States."

126.    On May 1, 2014, Bresch stated in an earnings call: "We continue to see stability really across our entire generic line on pricing."

127.    On August 7, 2014, Bresch stated in an earnings call:

> As far as pricing, look, I think that, that stability in our North American – that core business is certainly why we're able to deliver the results we have today, which, like I said, despite those product delays, we see growth year-over-year.  We've seen North America continue to maximize opportunities.

128.    On October 30, 2015, Mylan's CFO John Sheehan stated in an earnings call:

> With respect to gross margin, I guess I would start by pointing out that since 2010 our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at this year of 55%.  So the gross margins have been sustained.  They have steadily increased over the last five, six years.  . . . It also has been driven by the positive pricing environment that we've seen, especially over the last couple of years in North America.

129.    During the same call, Bresch stated: "Look, I would say as far as price increases, we've had a very consistent approach.  We have absolutely had opportunities around generic pricing."

130.    On February 10, 2016, Bresch stated in an earnings call her belief that Mylan had been "a very responsible generic player with hundreds of products into the market and have shown very responsibly price erosion."

131.    Mylan reported rising revenues in its United States generics business during the Class Period.

132.    **Par:** In a May 18, 2015 presentation by Endo International plc concerning its acquisition of Par, Endo noted that "consolidation and maturation of competitors have stabilized the pricing environment" for generic pharmaceuticals in the U.S.

133.     On August 8, 2016, Par's President Paul Campanelli stated in response to a question about the generics environment: "And typically you want to just be very careful about trying to go after too much share.  You just have got to take a balanced approach."

134.     Par reported rising revenues in its United States generics business during the Class Period.

135.     **Zydus:** On October 31, 2013, Cadila (Zydus' parent company) Executive Director Ganesh Nayak stated during an earning call: "This quarter, the major growth has come from price improvement and not actually from new product."

136.     During the same call, Cadila's Chairman and Managing Director Pankaj Patel noted:

> Up to last quarter, we were [seeing] pricing pressure, but now we see that, on selective products we are able to actually up the price. So it is the kind of a mixed scenario at this moment. We are seeing some visibility where pricing are firming up given the kind of challenges companies are facing, many players are going out of the market, and as a result there are opportunities to basically products with low margins to increase prices. So at least in 3 or 4 products, we have seen price being better and increases are ranging between 10-15% and we also see that the trend is likely to continue given the revised wisdom the industry is getting.

137.     Cadila reported rising revenues in its United States generics business (*i.e.*, Zydus) during the Class Period.

> **2.     Industry commentary indicates collusion is a plausible explanation for the increase in Divalproex ER price**

138.     Comments from industry analysts suggest that collusions is a plausible explanation for the increase in Divalproex ER, and other generic pharmaceutical, prices.  For instance, Richard Evans at Sector & Sovereign Research wrote:

> A plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose

characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation.[39]

139.    According to one study, since 2013 approximately one in 19 generic drugs sold in the United States have undergone major price hikes that may be consistent with collusion:

> Fideres Partners LLP, a London-based consultancy that works with law firms to bring litigation against companies, reported "anomalous pricing patterns" in scores of generic drugs sold in the U.S. from 2013 to 2016.  It identified 90 medicines whose prices rose at least 250 percent over the three-year period and were increased by at least two drug companies around the same time, even though there was no obvious market reason for the increases.  The average price jump among the 90 drugs was 1,350 percent, Fideres found.
>
> "I don't think the public or even the politicians in the U.S. have any idea just how widespread and extreme the phenomenon is," said Alberto Thomas, one of Fideres's founders.[40]

140.    Another study concluded that in 2014, "292 generic medication listings went up by 10% or more, 109 at least doubled in price and 14 went up by ten or more times in price that year."[41]  The GAO Report also noted similar "extraordinary price increases" across many generic drugs in recent years that could not be linked to any particular cause.

---

[39] *See* Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?*, WALL STREET JOURNAL (Apr. 22, 2015), *available at* http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[40] Liam Vaughan and Jered S. Hopkins, *Mylan, Teva Led Peers in "Anomalous" Price Moves, Study Says*, BLOOMBERG (Dec. 22, 2016) *available at* https://www.bloomberg.com/news/articles/2016-12-22/widespread-drug-price-increases-point-to-collusion-study-finds.

[41] David Belk, MD, *Generic Medication Prices*, *available at* http://truecostofhealthcare.net/generic_medication_prices/.

141.    In 2015, the *Financial Times* reported on Defendant Teva's planned merger with Mylan and quoted Mylan as cautioning that it could be blocked by regulators concerned "about pricing power and potential for drug shortages."[42]

142.    Pennsylvania physicians through the Pennsylvania Medical Society called on state and federal governments to investigate surging generic prices, believing anticompetitive conduct was to blame:

> According to Robert Campbell MD, chair of Physicians Against Drug Shortages and immediate past president of the Pennsylvania Society of Anesthesiologists, surging prices have hit hundreds of mainstay generics, including anesthetics, chemotherapeutic agents, antibiotics, and nutritional intravenous solutions. He believes the surging prices are a result of anti-competitive behavior.[43]

**D.    Defendants' Conduct in Generic Drug Pricing Is Under Investigation by the United States Congress, the DOJ, and the State Attorneys General.**

**1.    Congress launched an investigation in response to news reports of a dramatic rise in price of certain generic drugs.**

143.    As noted above, in January 2014 the NCPA sent correspondence to the United States Senate HELP Committee and the United States House Energy and Commerce Committee requesting hearings on significant spikes in generic pharmaceutical pricing.

144.    On October 2, 2014, Senator Bernie Sanders (I-VT), Chair of the Subcommittee on Primary Health and Aging, Senate Committee on Health, Education, Labor and Pensions, and Representative Elijah E. Cummings (D-MD), the Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers, including Dr. Reddy's,

---

[42] David Crow, *Teva bids for Mylan amid pressure on copycat drugmakers,* THE FINANCIAL TIMES (May 12, 2015), *available at* https://www.ft.com/content/8ff2fc5a-f513-11e4-8a42-00144feab7de.

[43] Pennsylvania Medical Society, Press Release, *Rising Generic Drug Costs Have Physicians Raising Red Flags* (Feb. 5, 2016), *available at* http://www.prnewswire.com/news-releases/rising-generic-drug-costs-have-physicians-raising-red-flags-300216006.html.

Mylan, Par, and Zydus, requesting information about the escalating prices of generic drugs used to treat everything from common medical conditions to life-threatening illnesses.[44]

145.    Senator Sanders and Representative Cummings issued a joint press release, advising "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses."  They noted the "huge upswings in generic drug prices that are hurting patients" are having a "'very significant'" impact threatening pharmacists' ability to remain in business.[45]

146.    The October Letter to Zydus, for example, states,

> We are writing to your company to request information about the escalating prices it has been charging for two drugs: Divalproex Sodium ER, which is used to prevent migraines and certain types of seizures and Pravastatin Sodium, which is used to treat high cholesterol. According to data provided by the Healthcare Supply Chain Association (HSCA), the average price charged for these drugs have increased as much as 736 percent for Divalproex Sodium . . . from October 2013 to April 2014.  Over that time period, the average market price went up by as much as $735 for Divalproex Sodium[.][46]

147.    In Zydus's October Letter, Senator Sanders and Representative Cummings requested the following information and documents from January 1, 2012, to the present:

(1)    Total gross revenues from the company's sales of these drugs;

(2)    The dates, quantities, purchasers, and prices paid for all sales of these drugs;

---

[44] U.S. Senator Bernie Sanders Website, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[45] *Id.*

[46] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Joseph Renner, Zydus CEO, *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

(3)     Total expenses relating to the sales of these drugs, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable;

(4)     Sales contracts or purchase agreements for active pharmaceutical ingredients for these drugs, including any agreements relating to exclusivity, if applicable;

(5)     A description and valuation of the specific financial and non-financial factors that contributed to your company's decisions to increase the prices of these drugs;

(6)     Any cost estimates, profit projections, or other analyses relating to the company's current and future sales of these drugs;

(7)     Prices of these drugs in all foreign countries or markets, including price information for the countries paying the highest and lowest prices; and

(8)     The identity of company official(s) responsible for setting the prices of these drugs over the above time period.

148.    Zydus's letter provided that the requested information and documents be turned in to congressional offices by October 23, 2014.

149.    On February 24, 2015, Senator Sanders and Representative Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[47]  The OIG responded to the request on April 13, 2015, advising it would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [Average Manufacturer Pricing] exceeded the specified inflation factor."[48]

---

[47] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[48] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. to Bernie Sanders, United States Senator (Apr. 13, 2015), *available at* http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

150.     In August 2016, the United States GAO issued its report finding "extraordinary price increases" on many generic pharmaceuticals, including Divalproex ER.[49]

### 2.     The DOJ launched a broad criminal investigation into anticompetitive conduct by generic drug manufacturers.

151.     The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry on or around November 3, 2014.  The DOJ also empaneled a grand jury in this District at about the same time.

152.     Initial reports suggest that, at the beginning, the DOJ's probe was focused on two generic drugs: digoxin and doxycycline.  However, news reports, court filings, and other public statements have confirmed the sweeping nature of the DOJ's investigation.  Reportedly, the DOJ believes price-fixing between makers of generic pharmaceuticals is widespread, and its investigation could become the next auto parts investigation, which is the DOJ's largest prosecution to date.[50]  According to sources cited by *Bloomberg*, the DOJ investigation already "spans more than a dozen companies and about two dozen drugs."[51]

153.     Each of the Defendants here has been ensnared in the DOJ's ongoing probe.

154.     **Dr. Reddy's**: In November 2016, Dr. Reddy's disclosed in an SEC filing that it had received a subpoena from the DOJ on July 6, 2016, "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with

---

[49] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 2016), *available at* http://www.gao.gov/assets/680/679055.pdf.

[50] Joshua Sisco, *DoJ believes collusion over generic drug prices widespread—source*, POLICY AND REGULATORY REPORT (June 26, 2015), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[51] David McLaughlin and Caroline Chen, *U.S. Charges in Generic Drug Probe to be Filed by Year-End*, BLOOMBERG (Nov. 3, 2016), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

competitors about such products" and that received a subpoena from the CTAG concerning the same matters.[52]

155.    **Mylan**: Mylan disclosed in a 2016 filing with the United States Securities and Exchange Commission (SEC) that it received a DOJ subpoena "seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products." [53]  Mylan received a similar subpoena from the CTAG, seeking "information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[54]

156.    Subsequently, on November 9, 2016, Mylan disclosed in its quarterly report that both it and "certain employees and senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products and any communications with competitors about such products."[55]  Significantly, Mylan disclosed that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[56]

157.    **Par**: Defendant Par disclosed in an SEC Form 10-K for 2014 that it received a subpoena from the CTAG on August 6, 2014, requesting documents related to digoxin and that it

---

[52] Dr. Reddy's SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[53] Mylan SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[54] *Id.*

[55] Mylan SEC Form 10-Q (Nov. 9, 2016), at 58, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

[56] *Id.*

had completed its response on October 28, 2014.[57]  Par subsequently received a DOJ subpoena

on December 5, 2014, "requesting documents related to communications with competitors

regarding [its] authorized generic version of Covis's Lanoxin® (digoxin) oral tablets and [its]

generic doxycycline products."[58]  In December 2015, Endo Pharmaceuticals Inc. (Par's parent

company) disclosed that it "received Interrogatories and Subpoena Duces Tecum from the

[CTAG] requesting information regarding pricing of certain of its generic products, including

doxycycline hyclate, amitriptyline hydrochloride, doxazosin mesylate, methotrexate sodium and

oxybutynin chloride."

158.    **Zydus**: Although Defendant Zydus is not publicly traded in the United States and

thus not subject to reporting requirements under federal securities laws, recent press reports have

stated the Zydus is also a target of the DOJ's sweeping investigation. According to one article,

Zydus is being investigated in connection with its marketing and sale of divalproex extended

release.[59]

159.    Defendants are not alone.  Numerous other generic manufacturers have likewise

received subpoenas in connection with the DOJ's and the State AGs' broad investigations into

anticompetitive conduct in the generic drug industry.  Additionally, some of these generic

manufacturers have disclosed that search warrants have been executed or that certain employees

have been separately subpoenaed as part of these ongoing probes.

---

[57] Par SEC 2014 Form 10-K (Mar. 12, 2015), at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[58] *Id.*

[59] Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, THE TIMES OF INDIA, *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian-pharma-cos/articleshow/55301060.cms.

160.     The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual.  Section F.1 of that chapter notes that when deciding whether to request the initiation of a grand jury investigation "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[60]  The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division.[61]  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General.  If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation."[62]  "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[63]

161.     Receipt of federal grand jury subpoenas is an indication that antitrust offenses have occurred.

162.     That a target has reportedly applied for leniency is also significant.[64]  As the DOJ notes on its web site (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

---

[60] DOJ, ANTITRUST DIVISION MANUAL (5th ed. 2015) at III-82.

[61] *Id.*

[62] *Id.* at III-83.

[63] *Id.*

[64] Leah Nylen and Josh Sisco, *Generic drug investigation started small before ballooning to dozen companies*, MLEX (Nov. 4, 2016) ("While the Justice Department didn't have a whistleblower at the beginning of the investigation, it is understood that [in the summer of 2016]

**5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**

Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will not qualify for leniency through the Leniency Program.

The DOJ further provides that the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id.*

163.    The DOJ's first charges were made on December 12, 2016, against two generic industry executives (Glazer and Malek) with criminal counts related to price collusion for generic doxycycline hyclate and glyburide. *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).

164.    These cases allege that these former senior executives of generic drug maker Heritage Pharmaceuticals Inc. violated Section 1 of the Sherman Act by participating in conspiracies to fix prices, rig bids, and engage in market and customer allocation for generic glyburide and doxycycline. On January 9, 2017, both Glazer and Malek pleaded guilty to the charges. The DOJ charges mention that Glazer and Malek's co-conspirators included

---

a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations."), *available at* http://www.mlex.com/GlobalAntitrust/DetailView.aspx?cid=841053&siteid=191&rdir=1.

"individuals that [Glazer] supervised at his company and those he reported to at his company's parent[.]"[65]  Sentencing for both Glazer and Malek was originally set for April 2017 but was later rescheduled to September 2017 as they continue to cooperate with the DOJ.  Evidence reportedly unearthed in the State AGs' action shows that Malek compiled a large list of generic drugs and instructed employees to contact competitors to reach agreement to increase prices and engage in market and customer allocation, and that some competitors were willing to reach such agreement.

165.    The DOJ has intervened in MDL 2724 as well as numerous civil antitrust actions alleging price-fixing, bid rigging, and market and customer allocation of generic pharmaceuticals stating that these cases overlap with the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action related to the generic pharmaceutical propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Glazer and Malek] informations that were unsealed."[66]  The DOJ filed a brief with the United States Judicial Panel on Multidistrict Litigation noting that, "The complaints in those civil cases – which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug – overlap significantly with

---

[65] Transcript of Jan. 9, 2017 Plea Hearing, *United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS, ECF 24 at 19 (E.D. Pa.).  A similar statement appears in the transcript from Malek's plea hearing.

[66] *See* Transcript of Hearing, *FWK Holdings, LLC v. Actavis Elizabeth, LLC*, No. 16-cv-9901, ECF 112 (S.D.N.Y. Feb. 21, 2017).

aspects of the ongoing criminal investigation."[67]  As noted above, the DOJ also filed a motion for

a stay of discovery in MDL 2724 stating that: "Evidence uncovered during the criminal

investigation implicates other companies and individuals (including a significant number of the

Defendants here) in collusion with respect to doxycycline hyclate, glyburide, and other drugs

(including a significant number of the drugs at issue here)."[68]

166.    The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every
> year and rely on generic pharmaceuticals as a more affordable
> alternative to brand name medicines.  The Division's investigation
> into the generics market, however, has revealed that some
> executives have sought to collude on prices and enrich themselves
> at the expense of American consumers.[69]

**3.    Led by the State of Connecticut, 45 attorneys general launched their own
investigation of antitrust violations in the generic drug industry.**

167.    The State AGs' action was filed just days after the DOJ filed its first criminal

charges against two former executives of Heritage Pharmaceuticals.  According to the State

AGs' complaint, the information developed through its investigation (which is still ongoing)

uncovered evidence of a broad, well-coordinated, and long-running series of schemes to fix the

prices and allocate markets for a number of generic pharmaceuticals in the United States.

Although the State AGs' action currently focuses on doxycycline hyclate and glyburide, it

alleges that the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating

---

[67] *See* Memorandum of Amicus Curiae United States of America Concerning
Consolidation, *In re: Generic Digoxin and Doxycycline Antitrust Litig.*, MDL No. 2724, ECF
284 (J.P.M.L. Mar. 10, 2017).

[68] *See* Intervenor United States' Motion to Stay Discovery, *In re: Generic Pharm. Pricing
Antitrust Litigation*, MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

[69] DOJ Website, Division Update Spring 2017 (Mar. 28, 2017), *available at*
https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

numerous different generic pharmaceuticals and competitors.  As reported by *The Connecticut Mirror*, the State AGs "suspected fraud on a broader, nearly unimaginable scale" and "new subpoenas are going out, and the investigation is growing beyond the companies named in the suit."[70]  CTAG George Jepsen has called evidence that has so far been obtained in the State AGs' investigation "mind-boggling."[71]

168.    CTAG George Jepsen confirmed the scope of the State AGs' action in the following press release:

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States. . . . While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers – and, indeed, our healthcare system as a whole – who paid for these actions through artificially high prices for generic drugs. We intend to pursue this and other enforcement actions aggressively, and look forward to working with our colleagues across the country to restore competition and integrity to this important market.[72]

169.    In filings with the United States Judicial Panel on Multidistrict Litigation on May 16, 2017 and June 13, 2017, the State AGs reiterated that their ongoing investigation is broad in scope and goes beyond doxycycline hyclate DR and glyburide.[73]  The State AGs further stated

---

[70] Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, The Connecticut Mirror (Jan. 27, 2017), *available at* https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.  *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the CTAG issued its first subpoena.  *Id.*

[71] *Id.*

[72] CTAG Website, Press Release, *Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies* (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[73] *See* Brief and Reply in Support of Plaintiff States' Motion to Vacate Conditional Transfer Order (CTO-3), *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, ECF 321 & 334 (J.P.M.L. May 16, 2017 & June 13, 2017).

that their doxycycline hyclate DR and glyburide action "encompass[es] illegal agreements – including with regard to Doxy DR – where prices remained constant (or remained higher than they would have been in a competitive market) as a result of customer or market allocation agreements designed specifically to avoid price erosion[.]"  The State AGs also disclosed that they have entered into settlements with Glazer and Malek and that these settlements require Glazer and Malek's cooperation with the State AGs.

170.   During a conference call on July 27, 2017, W. Joseph Nielsen, an assistant AG for the State of Connecticut, said "he expects future actions by the group of states investigating price-fixing and market allocation in the generic drug industry" including "more lawsuits against additional generic manufacturers for additional drugs [and] lawsuits against high-level executives for their roles in the collusion."[74]  Nielsen also stated that the States AGs realized very quickly that the generic drug industry is "set up structurally in a way that fosters and promotes collusion among generic competitors" and that the State AGs' investigation "has expanded greatly to the point where we are now looking at numerous drugs."

171.   New York AG Eric T. Schneiderman also reported that the State AGs have "uncovered evidence of a broad, well-coordinated and long running series of conspiracies to fix prices and allocate markets for certain generic pharmaceuticals in the United States."[75]

172.   The DOJ's and State AGs' investigations of alleged price-fixing and other unlawful conduct in the generic pharmaceutical industry are ongoing.

---

[74] Can Calik, *Future actions by state enforcers expected over generic drug collusion, Connecticut official says*, MLEX (July 27, 2017), *available at* http://www.mlex.com/GlobalAntitrust/DetailView.aspx?cid=908454&siteid=191&rdir=1.

[75] New York AG Website, Press Release, *A.G. Schneiderman Files Federal Antitrust Lawsuit With 19 Other States Against Heritage Pharmaceuticals And Other Generic Drug Companies* (Dec. 15, 2016), *available at* https://ag.ny.gov/press-release/ag-schneiderman-files-federal-antitrust-lawsuit-19-other-states-against-heritage.

### VI.   THE DIVALPROEX ER MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION

173.   Because Defendants' anticompetitive conduct constitutes a conspiracy to fix

prices and engage in market and customer allocation, which is a *per se* violation of Section 1 of

the Sherman Antitrust Act, Plaintiffs need not define a relevant market.  However, there are

features of the market relevant to this case that show both (i) that the market is susceptible to

collusion and (ii) that the price increases were in fact the result of collusion and not the result of

conscious parallelism.

174.   Factors showing that a market is susceptible to collusion include in this case:

(1)   **High Level of Industry Concentration** – A small number of competitors (Defendants) control a significant market share for Divalproex ER, as detailed above.  During the Class Period the Defendants together accounted for roughly ■■■■ of the market for these products.

(2)   **Sufficient Numbers to Drive Competition** – While the market for Divalproex ER had a small enough number of competitors to foster collusion, the number of sellers was large enough that – given decades of experience with competitive generic pricing, and accepted models of how generic companies vigorously compete on price – one would have expected prices to remain at their historical, near marginal cost levels.  With the number of generic competitors such as there were here, historical fact and accepted economics teaches that – absent collusion – prices would have remained at competitive levels.

(3)   **High Barriers to Entry** – The high costs of manufacture, intellectual property, and expenses related to regulatory approval and oversight are among the barriers to entry in the generic drug market.  By delaying new entrants, and limiting the number of potential entrants, these barriers to entry and others increase the market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

(4)   **High Inelasticity of Demand and Lack of Substitutes**– For most patients that rely on Divalproex ER, it is a necessity that must be purchased based on medical need,

regardless of price hikes.  While there are other drugs on the market for the treatment of migraines and seizures, there are significant barriers to changing treatments.  Many patients are unable to substitute other medications for Divalproex ER.  For example, anticonvulsants gabapentin and topiramate have different pharmacokinetic profiles when compared to valproate, from which Divalproex ER is derived. As a result, these compounds are not considered therapeutically equivalent and would not be substituted for Divalproex ER at the pharmacy level.

(5)    **Commoditized Market** – Defendants' Divalproex ER products are fully interchangeable because they are bioequivalent to one another by FDA standards.  Thus, all manufactured versions of Divalproex ER are therapeutically equivalent to each other and pharmacists may substitute one for another interchangeably.

(6)    **Absence of Departures from the Market** – There were no departures from the market that could explain the price increases.

(7)    **Opportunities for Contact and Communication Among Competitors** – Defendants participate in the committees and events of the GPhA, HDMA, NACDS, ECRM, and other industry groups, which provide and promote opportunities to communicate.  The grand jury subpoenas to Defendants targeting inter-Defendant communications, further supports the existence of communication lines between competitors with respect to, among other things, generic pricing.

(8)    **Size of Price Increases** – The magnitude of the price increases involved in this case further differentiates them from parallel price increases.  Oligopolists seeking to test market increases need to take measured approaches.  But here the increases are not 5% or even 10% jumps – the increases are of far greater magnitude.  A rational company would not implement such large increases unless certain that its ostensible competitors would follow.

(9)    **Reimbursement of Generic Drugs** – This market, as with many generic markets, has institutional features that would inhibit non-collusive parallel price increases.  The reimbursement for generic pharmaceuticals to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical

> paid by retail pharmacies purchasing from a wholesaler for each of a pharmaceutical's generic equivalent versions.  As a result, the usual inhibition of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system.

175.   Through their market dominance, Defendants have been able to substantially foreclose the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs and the proposed Class members inflated prices above competitive levels for Divalproex ER through unlawful price collusion.

## VII.   CLASS ACTION ALLEGATIONS

176.   Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this action on behalf of a Class defined as:

> All persons or entities that directly purchased Divalproex ER (generic divalproex sodium 250 or 500 mg extended release 24 hour sustained action tablets) from one or more of the Defendants in the United States and its territories and possessions at any time during the period from June 2013 through the present (the "Class Period").

> Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all governmental entities.

177.   Members of the Class are so numerous that joinder is impracticable.  Plaintiffs believe that there are dozens of Class members, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.  Further, the Class members are readily identifiable from information and records maintained by Defendants.

178.   Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other Class members, and there are no material conflicts with any other member of the Class that would make class certification inappropriate.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

PUBLIC VERSION

179.     Plaintiffs will fairly and adequately protect and represent the interests of the Class and Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

180.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

181.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.  Thus, determining damages with respect to the Class as a whole is appropriate.  The common applicability of the relevant facts to claims of Plaintiffs and the proposed class is inherent in Defendants' wrongful conduct, because the overcharge injuries incurred by Plaintiffs and each member of the proposed class arose from the same collusive conduct alleged herein.

182.     The common legal and factual questions do not vary among Class members and may be determined without reference to individual circumstances, and include, but are not limited to, the following:

(a)     Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to eliminate competition and thereby increase the prices of Divalproex ER in the United States;

(b)     The duration and extent of the alleged contract, combination, or conspiracy between and among Defendants and their co-conspirators;

(c)     Whether Defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

(d)     The effect of the contract, combination, or conspiracy on the prices of Divalproex ER in the United States during the Class Period;

(e)     Whether Defendants' conduct caused supracompetitive prices for Divalproex ER;

(f)     Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiffs and other members of the Class; and

     (g)     Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

183.     Treatment as a class action is the superior method for the fair and efficient adjudication of this controversy, as it will permit numerous similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, avoiding unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding as a class action, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

184.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.   ANTITRUST INJURY

185.     During the Class Period, Plaintiffs and Class members directly purchased Divalproex ER from Defendants.  Because of the Defendants' anticompetitive conduct, Plaintiffs and Class members were forced to pay more for Divalproex ER than they otherwise would have, and thus have suffered substantial overcharge damages at the hands of Defendants.  This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

186.     Defendants' unlawful conduct has successfully eliminated competition in the market, and Plaintiffs and Class members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants.  The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

187.     Defendants, through their unlawful conduct alleged herein, reduced competition in the Divalproex ER market, increased prices, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges.

PUBLIC VERSION

188.    Because Defendants' anticompetitive conduct is ongoing, Plaintiffs and the Class continue to pay supracompetitive prices for Divalproex ER through the present.

## IX.    CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN ACT

189.    Plaintiffs repeat and re-allege the foregoing as though fully set forth herein.

190.    In violation of Section 1 of the Sherman Antitrust Act, Defendants entered agreements with one another concerning the pricing of Divalproex ER in the United States.  This conspiracy was *per se* unlawful price-fixing.

191.    Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts were intentional, were directed at the sales of Divalproex ER in the United States, and had a substantial and foreseeable effect on interstate commerce by raising and fixing Divalproex ER prices throughout the United States.

192.    The conspiracy had its intended effect, because Defendants have benefited—and continue to benefit—from their collusion and the elimination of competition, both of which artificially inflated the prices of Divalproex ER.

193.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

a.      Prices charged to and paid by Plaintiffs for Divalproex ER were artificially raised, fixed, maintained, or stabilized at supracompetitive levels;

b.      Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the sale of Divalproex ER in the United States market; and

c.      Competition in establishing the prices paid for Divalproex ER was unlawfully restrained, suppressed, or eliminated.

194.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property in that they have paid more for

Divalproex ER than they otherwise would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

195.    Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

196.    There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

197.    Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class members pray for relief from this Court and request:

A.    Certification as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.    Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.    A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

D.    An award to Plaintiffs and Class members of pre-judgment and post-judgment interest at the highest legal rate provided by law from and after the date of service of the first-filed Complaint in this action;

E.     An award to Plaintiffs and Class members of the costs of this suit, including reasonable attorney fees; and

F.     An award of any further relief as the Court deems just and proper.

## XI.     JURY TRIAL DEMANDED

Plaintiffs hereby request a jury trial on all claims so triable.

Dated August 15, 2017

NASTLAW LLC

By: _Dianne M. Nast_ (signature)

Dianne M. Nast

Dianne M. Nast (PA Bar No. 24424)
Erin C. Burns (PA Bar No. 89742)
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
215-923-9300
215-923-9302 (fax)
dnast@nastlaw.com
eburns@nastlaw.com

**_LEAD AND LIAISON COUNSEL_**

BERGER & MONTAGUE P.C.
David F. Sorensen
Zachary D. Caplan
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000
dsorensen@bm.net
zcaplan@bm.net

KAPLAN FOX & KILSHEIMER LLP
Robert N. Kaplan
Elana Katcher
850 Third Avenue
New York, New York 10022
(212) 687-1980
rkaplan@kaplanfox.com
ekatcher@kaplanfox.com

ROBERTS LAW FIRM P.A.
Michael L. Roberts
Jana K. Law
20 Rahling Circle
Little Rock, Arkansas 72223
(501) 821-5575
mikeroberts@robertslawfirm.us
janalaw@robertslawfirm.us

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
David S. Nalven
55 Cambridge Parkway, Suite 301
Cambridge, Massachusetts  02142
617-482-3700
tom@hbsslaw.com
davidn@hbsslaw.com

Barbara A. Mahoney
1918 8th Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292
bmahoney@hbsslaw.com

NUSSBAUM LAW GROUP P.C.
Linda P. Nussbaum
Bradley J. Demuth
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
(917) 438-9102
lnussbaum@nusspaumpc.com
bdemuth@nussbaumpc.com

**_DIRECT PURCHASER PLAINTIFFS' STEERING COMMITTEE_**

COHEN MILSTEIN SELLERS &
TOLL PLLC
Sharon K. Robertson
Donna M. Evans
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
srobertson@cohenmilstein.com
devans@cohenmilstein.com

GUSTAFSON GLUEK PLLC
Daniel E. Gustafson
Daniel C. Hedlund
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, Minnesota 55402
(612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

SALTZ MONGELUZZI BARRETT &
BENDESKY P.C.
Simon B. Paris
Patrick Howard
One Liberty Place, 52nd Floor
Philadelphia, Pennsylvania 19103
(215) 496-8282
sparis@smbb.com
phoward@smbb.com

VANEK, VICKERS & MASINI P.C.
Joseph M. Vanek
David P. Germaine
55 West Monroe, Suite 3500
Chicago, Illinois 60603
(312) 224-1500
jvanek@vaneklaw.com
dgermaine@vaneklaw.com

ZIMMERMAN REED LLP
Charles S. Zimmerman
David M. Cialkowski
1100 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
(612) 341-0400
charles.zimmerman@zimmreed.com
david.cialkowski@zimmreed.com

FARUQI & FARUQI LLP
Peter Kohn
Joseph T. Lukens
101 Greenwood Avenue, Suite 600
Jenkintown, Pennsylvania 19046
(215) 277-5770
pkohn@faruqilaw.com
jlukens@faruqilaw.com

RADICE LAW FIRM
John D. Radice
April D. Lambert
34 Sunset Blvd
Long Beach, New Jersey  08008
(646) 245-8502
jradice@radicelawfirm.com
alambert@radiclawfirm.com

TAUS, CEBULASH & LANDAU LLP
Barry S. Taus
Kevin Landau
80 Maiden Lane, Suite 1204
New York, New York 10038
(212) 931-0704
btaus@tcllaw.com
klandau@tcllaw.com

WEXLER WALLACE LLP
Kenneth A. Wexler
Bethany R. Turke
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 346-2222
kaw@wexlerwallace.com
brt@wexlerwallace.com

*ADDITIONAL COUNSEL TO DIRECT PURCHASER PLAINTIFFS*

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2017, a copy of the Consolidated Direct Purchaser

Class Action Complaint was manually filed under seal with the Clerk of the Court and served

upon counsel of record via electronic mail.

Dianne M. Nast